WAUKEEN Q. MCCOY, ESQ. (SBN 168228)
McCoy Law Firm, P.C.
111 Maiden Lane, 6th Floor
San Francisco, California 94108
Telephone: (415) 675-7705
Facsimile: (415) 675-2530
Email: mail@mccoyslaw.com

Attorney for Plaintiff
CHRISTOPHER COULTER

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| CHRISTOPHER COULTER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>THE DEPARTMENT OF THE AIR FORCE, DEBORAH LEE JAMES, SECRETARY OF THE DEPARTMENT OF THE AIR FORCE, UNITED STATES OF AMERICA, and DOES 1-20,<br><br>Defendant. | Case No.:<br><br>**UNLIMITED JURISDICTION**<br><br>**COMPLAINT**<br><br>1. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff CHRISTOPHER COULTER hereby complains of Defendant THE DEPARTMENT OF THE AIR FORCE, DEBORAH LEE JAMES, THE SECRETARY OF THE AIR FORCE, and as for his claims and causes of action alleges as follows based on information and belief.

///

## THE PARTIES

1. Plaintiff Christopher Coulter ("PLAINTIFF" or "COULTER") is a 48-year-old Caucasian male who was a former United States Air Force Watch Supervisor Air Traffic Controller and Senior Airfield Operations Automation Manager for Travis Air Force Base ("Travis AFB"). COULTER resides in FAIRFIELD, CA

2. Defendant The Department of the Air Force, Deborah Lee James, Secretary of the Department of the Air Force, United States of America ("DEFENDANT") is a government entity. The headquarters for Department of the Air Force, Deborah Lee James is Joint Base Andrews, Maryland. DEFENDANT is an entity that operates Travis AFB, and is authorized by the State of California to operate an Air Force base in California.

3. The true names and capacities, whether corporate, associate, individual, or otherwise, of DOES 1 through 20 are unknown to Plaintiff, who therefore sues such DOES by fictitious names. Each of the Defendants designated herein as DOE is legally responsible in some manner of the wrongful acts, and for the injury and damage to Plaintiff herein alleged. Plaintiff will seek leave of Court to amend this Complaint to show the true names and capacities of DOES once such names and capacities have been ascertained.

4. At all times mentioned in this complaint, unless otherwise specifically alleged, each of Defendants was the agent, partner, employee, conspirator and/or aider-and-abettor of all other Defendants, and in doing acts alleged in this complaint was acting: (a) within the course, scope and authority of that agency, partnership, employment, conspiracy and/or other relationship; and (b) with the knowledge, aid and/or consent of each of the other Defendants.

## JURISDICTION AND VENUE

5. Plaintiff brings this action under the Federal Torts Claim Act.

6. This Court has jurisdiction pursuant to the following statute:

   a. 28 U.S.C. § 1346, which gives district courts original jurisdiction over civil actions arising against the United States of America;

   b. 28 U.S.C. § 2671, which gives district courts original jurisdiction involving tort claims by an employee of the government.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the events, as recited herein, that gave rise to this Complaint occurred in this district.

## FACTUAL BACKGROUND

8. On or about October 2008, COULTER began working at Travis Air Force Base ("Travis AFB") as a civilian Air Traffic Controller. COULTER performed his duties admirably and received stellar performance reviews. He was eventually promoted to Senior Airfield Operations Automation Manager. COULTER's Air Traffic Control experience includes three separate level III RAPCON certifications, two NASA MRU certifications, five separate Tower Certifications, and a NASA Base Operations certification.

9. On or about February 20, 2012, there was a Class I mishap at Travis AFB resulting in a mid-air collision of two light civilian aircrafts. After the incident occurred COULTER was specifically instructed to do the playback of the incident in front of Flight Safety Officers and his superior Major Michael Endres ("Major Endres"). While doing the playback, COULTER was asked directly by a Flight Safety Officer why the collision occurred. In response, COULTER told the Flight Safety Officers and Major Endres that the Air Traffic Controller and the Assistant Controller during this incident failed to provide traffic alerts and traffic advisories, violating FAA Joint Order 7110.65.

10. Immediately after COULTER completed the playback, Major Endres pulled COULTER aside and told him bluntly that he is never allowed to speak to a Flight Safety Officer while conducting a playback. COULTER was confused, disturbed and taken aback by this instruction because he did not feel comfortable not following orders of a Flight Safety Officer. In that moment, COULTER felt that Major Endres abused his authority to force COULTER to not speak about failures of other Air Traffic Controllers and their lack of following proper procedure and protocol to prevent air collisions.

11. After the February 20, 2012 incident, as well as other previous mishaps and near misses, COULTER believed the department needed to do something to prevent these incidents from occurring and promote flight safety. Based on his job description as a Senior Automation Manager, COULTER had good faith belief that he had a duty to manage and track critical

functionality for the STARS system, which included monitoring user activity. COULTER created excel spreadsheets called Administrative Pro Time Tracker and Daily Extraction Notes to track critical Air Traffic Control Automation functionality and continuity of operations. The data was tracked in an effort to show COULTER's superiors and co-workers the mishaps, errors, and violations of law, rules and procedure to better themselves as a department.

12. On a daily basis COULTER tracked activity, errors, mishaps, and violations of law, rules and procedure and logged them in his Administrative Pro Time Tracker and Daily Extraction Notes excel spreadsheets. After every shift, COULTER would email the spreadsheets to his chain of command, which included Major Endres, Chief Master Sargent Michael Murdock ("CMSgt. Murdock"), Major Shawn Stappen ("Major Stappen"), Lieutenant Rafael Carroll ("Lt. Carroll"), and Lieutenant Colonel Eric Weber ("Lt. Col. Weber"). COULTER would also upload them to the Managing Internal Control Toolset (MICT) system, which would also disperse the spreadsheets to his superiors.

13. As COULTER continued to track and log the numerous mishaps, errors, and violations of law, rules and procedure, he began to experience retaliatory behavior from his superiors and co-workers. On or about 2013, Major Stappen and Major Endres placed restrictions on COULTER, which included but were not limited to: not being in the break room, automation office, and attend on base award ceremonies (which were open to everyone on base) during his off duty hours; COULTER was required to check in with the Watch Supervisor before and after every shift; and COULTER was told not to park in a specific location. COULTER was the only civilian employee who was placed on these restrictions, and he was able to perform the aforementioned actions prior to his tracking and logging the various mishaps, errors, and violations of law, rules and procedure that were occurring.

14. Furthermore, COULTER was the only civilian employee who received satisfactory performance reviews who did not receive a year-end bonus or time off award. Prior to tracking mishaps, errors, and violations of law, rules and procedure COULTER would receive year-end bonuses and time off awards. COULTER was also denied overtime pay for work he performed outside his duty hours, while other similarly situated employees continued to get paid overtime

for similar hours worked. COULTER even filed a grievance against Major Stappen for violating the Automated Time and Attendance Production System (ATAAPS) policy by logging into COULTER's time card and changing his Unscheduled Overtime hours to Regular Hours without COULTER's consent or certification.

15. Other retaliatory actions from his superiors include Major Stappen placing unauthorized duty restrictions on COULTER's job duties, which prevented him from performing duties listed under his job title, such as tracking errors, mishaps and violations. His co-worker Joseph Blanco ("Blanco"), who was lesser ranked and in the same office as COULTER, did not have similar restrictions placed on him. It was COULTER's understanding that his superiors were putting him in vulnerable situations to build a case to terminate his employment. This is evident from a January 7, 2014 meeting between Major Endres, Blanco, and Staff Sargent Derek Pace ("SSgt. Pace") in COULTER's office, where COULTER overheard them discussing COULTER's excel spreadsheets, how they did not want to get "blindsided" during an inspection, and how they could get him terminated from his position.

16. One example of COULTER's superiors placing him vulnerable situations to justify a termination includes an August-September 2015 playback incident. On or about August 31, 2015, COULTER returned from a 10-day leave and was instructed by CMSgt. Murdock to setup a playback from August 21, 2015 to go over some flight safety issues. COULTER setup the playback and notified CMSgt. Murdock that the playback was ready for his review. CMSgt. Murdock declined to watch the playback, but requested COULTER that he watch the playback and take notes for a later review. COULTER did as instructed, watched the play back and took notes.

17. Shortly thereafter, CMSgt. Murdock, who did not watch the playback, told COULTER that there was a separation violation on his part on August 21, 2015. After thoroughly watching the playback himself, COULTER respectfully disagreed with CMSgt. Murdock, and watched the playback once more with a fellow Automation specialist to see if he a violation occurred. Immediately after watching the playback a second time, COULTER received an email from CMSgt. Murdock stating that he was not to conduct anymore playbacks.

18. On the same day after his exchange with CMSgt. Murdock, COULTER was informed by Pro Time manager Molly Wyrick that he was 23 minutes short of his Coordinator Arrival time. COULTER confirmed with the Watch Supervisor if he could open Coordinator Arrival to complete his pro-time. The Watch Supervisor told COULTER that he could go ahead and plug in. About ten minutes later, CMSgt. Murdock entered the IFR room and gestured to COULTER to stop what he was doing. COULTER immediately stopped, and CMSgt. Murdock explained to him that he was not to work until a determination was made on the August 21, 2015 air traffic issue. At no point that day was COULTER informed that his ratings were suspended and that he could not work air traffic. Moreover, the department did not receive notice of any change in COULTER's ratings status. CMsgt. Murdock did not follow proper procedure and protocol in regards to notifying COULTER and the department of his status to work air traffic, which put COULTER in a vulnerable situation to be written up for "failure to follow directive."

19. After the incident, COULTER was forced to sign illegal backdated Controller Evaluations related to the incident which contained false observations in violation of AFI 13-204 V3. CMSgt. Murdock threatened disciplinary action if I did not sign the evaluations. COULTER signed the evaluations as he feared he would lose his job if he did not comply.

20. On or about October 2, 2015, about a month after the playback incident, COULTER was called into a meeting with Lt. Col. Weber and Major Shawn Stappen. COULTER was informed that he would be placed on administrative leave. During the meeting COULTER requested union representation to be present but was denied, which violated his Weingarten rights. COULTER was forced to sign the administrative leave paperwork, told to box up his belongings and escorted off base by an armed guard. COULTER believes all the wrongful personnel actions taken against him were a result of his continued tracking and disclosing, as the superiors involved were aware of his tracking and the information that that his spreadsheets contained.

21. COULTER also received retaliatory actions from his co-workers. COULTER tracked and disclosed various errors and violations of law, rules and procedures conducted by fellow

Automation specialists Blanco and Fred Schreiber ("Schreiber"). Blanco and Schreiber were aware of COULTER's disclosures, and in retaliation filed false allegations against him assassinating his character and professionalism. COULTER was aware that Joseph Blanco wanted him terminated after overhearing him during the January 7, 2014 meeting in his office, where he was concerned about COULTER's spreadsheets and agreed with Major Endres and SSgt. Pace that COULTER should be removed from his position. Blanco's actions of making false allegations about COULTER's conduct are evidence to his attempt to build a case to terminate COULTER's employment.

22. Also in retaliation, on or about November 2014 Blanco placed COULTER's personal files and information on a RAPCON shared folder which violated the Personal Identifiable Information Policy. COULTER's personal documents and private information about his family was available to the public to access. COULTER reported this incident to his superiors Major Stappen and Lt. Col. Weber, but Major Stappen refused to take action. COULTER then reported the incident to Privacy Information Manager Maria Morris.

23. Due to the hostile work environment and continued retaliation COULTER experienced, COULTER suffered from extreme stress, anxiety, depression, dizziness and back spasms. Despite health issues, COULTER continued to challenge the treatment he was receiving from his superiors and co-workers. During the time COULTER was receiving personnel actions by his superiors, he approached Lt. Col. Weber to see if he could engage the Inspector General (IG) about the retaliation he was experiencing. Lt. Col. Weber assured COULTER he would, however, Lt. Col. Weber divulged during a grievance meeting on or about January 2017 that he failed to inform IG as required by AF Regulation 90-301 article 1.30.3 and 1.30.3.2. COULTER believes Lt. Col. Weber failed to follow proper protocol regarding IG complaints in retaliation to COULTER's continued tracking.

24. As COULTER continued to fight against the wrongful personnel actions taken against him, his symptoms of stress, depression, anxiety, dizziness and muscle pain exacerbated. Despite filing multiple grievances and seeking clarity from his superiors, COULTER was eventually terminated in February 2016 by Travis AFB. The recommendation for termination

came from his superiors Major Stappen and Lt. Col. Weber. Travis AFB alleges that COULTER was terminated for "conduct unbecoming" and "failure to follow directive." COULTER believes in good faith that his superiors and co-workers placed him in vulnerable situations and alleged false claims against him to build a case to terminate his employment.

25. During the period of time COULTER was retaliated and harassed against by his superiors and co-workers, he never was requested to take additional training, placed on a performance improvement plan, or received any progressive discipline for any alleged "failure to follow directive." Moreover, there are similarly situated employees who have been accused of far more egregious conduct, who were never disciplined and/or terminated from their employment. COULTER's termination was in direct result of his continued tracking and disclosures, which resulted in retaliatory actions by his superiors and false allegations by his co-workers. Due to the termination COULTER continued to suffer extreme stress, anxiety, depression, and migranes.

26. Since being removed from Travis AFB, COULTER's security clearance has been placed under review, preventing him from acquiring other similar employment. COULTER has applied to numerous positions with Air Force bases across the world, but has been unable to secure employment due to his security clearance being wrongfully placed under review. Moreover, employees have made disparaging comments about COULTER to prospective employers, which have exacerbated his inability to secure employment. As a result of COULTER's termination and inability to secure other similar employment, COULTER continued to experience severe emotional trauma, stress, anxiety and depression.

27. As COULTER continued to be denied multiple opportunities and Travis AFB holding his security clearance in review, COULTER's emotional trauma continued to persist which resulted with him being diagnosed with Neurocardiogenic Syncope. COULTER has traveled all over the country to find a similar job opportunity, which has taken time away from being with his wife and daughter. COULTER's daily lifestyle has changed tremendously compared to his lifestyle prior to experiencing retaliation and harassment from his superiors and co-workers at Travis AFB.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### Intentional Infliction of Emotional Distress
(Federal Torts Claim Act)

28. PLAINTIFF incorporates by reference the factual allegations set forth in paragraphs 1 through 27 above.

29. DEFENDANT, by and through its government agency Travis AFB, its agents and employees, without regard to the health and safety of PLAINTIFF, treated PLAINTIFF in the deplorable manner as alleged herein. The retaliation, harassment, wrongful termination, and the holding of PLAINTIFF's security clearance constitute extreme and outrageous conduct by DEFENDANT.

30. DEFENDANT's employees, standing in a position of authority over PLAINTIFF, acted deliberately and without regard to the health, safety, or well-being of PLAINTIFF and caused him severe emotional and physical distress.

31. DEFENDANT's conduct was outrageous and was intended to cause PLAINTIFF emotional distress.

32. As a direct and proximate result of DEFENDANT's extreme and outrageous acts, PLAINTIFF suffered severe emotional distress in the form of humiliation, embarrassment, mental-anguish, stress, anxiety and indignation. DEFENDANT's acts were done with the willful knowledge that PLAINTIFF could and likely would suffer severe emotional and physical harm as a result thereof.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays for relief as follows:

1. For general damages in excess of the jurisdictional limit of this court;
2. For special damages in amounts according to proof;

3. For punitive damages in amounts according to proof;

4. An order enjoining/restricting Defendant from further acts of retaliation;

5. For attorney's fees as provided by law;

6. An award of interest as provided by law;

7. Any and all other remedies provided pursuant to 5 U.S.C. § 1230 *et seq*;

8. For costs of suit incurred herein; and

9. For such other and further relief as the court deems fair and just.

## **DEMAND FOR JURY TRIAL**

PLAINTIFF hereby demands trial by jury for all causes of actions, claims and issues in this action triable by jury as a matter of right.

DATED: February 5, 2018

Respectfully submitted,

_____
WAUKEEN Q. MCCOY, ESQ
Attorney for Plaintiff
CHRISTOPHER COULTER